## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **COMRENT INTERNATIONAL, LLC,** | * | |
| | * | |
| **Plaintiff,** | * | **Civil Action No. RDB-20-3356** |
| **v.** | * | |
| **DAVID A. SMIDLEIN and DISTRIBUTED POWER SOLUTIONS, LLC,** | * | |
| | * | |
| **Defendants.** | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## <u>MEMORANDUM OPINION</u>

Plaintiff ComRent International, LLC ("ComRent" or "Plaintiff") brings this suit against its former employee, Defendant David A. Smidlein ("Smidlein"), and his new employer, Defendant Distributed Power Solutions, LLC ("DPS") (collectively "Defendants"). ComRent alleges breach of contract against Smidlein (Count I); tortious interference with contract against DPS (Count II); breach of fiduciary duty against Smidlein (Count III); aiding and abetting a breach of fiduciary duty against DPS (Count IV); and civil conspiracy against both Defendants (Count V). (ECF No. 1.) Presently pending is the Defendants' Motion to Dismiss for Failure to State a Claim (ECF No. 15). The parties' submission have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, Defendants' Motion to Dismiss (ECF No. 15) is DENIED.

## BACKGROUND

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).

## A. ComRent and Load Bank Industry

ComRent is a provider of equipment and services used to test, commission, and maintain power generation systems. (*See* Complaint ¶ 1, ECF No. 1).  Specifically, ComRent supplies what are known as "load banks."  (*Id.*)  Load banks are pieces of electrical test equipment used to simulate an electrical load and to test an electrical power source without connecting to its normal operating load.  (*Id.*)  ComRent rents its equipment to project owners in many different industries such as data centers and solar power generators.  (*Id.*)  ComRent also helps project owners design and manage a testing protocol, train their personnel, and maintain their power systems.  (*Id.*)

ComRent tailors its services to each specific customer, as power generation systems differ significantly by industry.  (*Id.* ¶ 18.)  For example, a data center has different power generation needs than a wind farm.  (*Id.*)  Industries differ not only in the types of power generation systems they use, but also in the regulations and safety standards to which they are subject.  (*Id.* ¶ 19.)  ComRent asserts that because power generation systems differ significantly by industry—and because each type of project owner is subject to different regulations, has varying safety requirements, and has distinct needs—there is a large and naturally existing barrier to entry for the load bank market.  (*Id.* ¶ 21.)  ComRent claims that over many years, through expertise developed over the course of thousands of projects and backed by millions

of dollars in investments in equipment, human talent, and training, it has become the leading provider of load bank solutions for each of the disparate kinds of project owners and their unique needs.  (*Id.*)

### B.  David Smidlein and His Employment at ComRent

Defendant Smidlein worked for ComRent for more than seven years.  (*Id.* ¶ 22.)  By the time of his resignation in June of 2020, Smidlein was one of ComRent's most senior executives working as a Vice President of Sales.  (*Id.* ¶¶ 22, 25.)  He was in charge of the entirety of ComRent's sales and marketing operations globally, including throughout the United States and Canada.  (*Id.* ¶ 23.)  As part of his job, Smidlein had contact with ComRent's customers and assisted in direct negotiations with them throughout his employment at ComRent.  (*Id.*)  By 2019, Smidlein also led the sales organization for a portion of the United States that included Colorado and all territories to the west of Colorado, along with all of Canada.  (*Id.*)  Smidlein participated in strategic conversations at the highest level for the company as a whole, including on matters such as companywide process changes, personnel decisions, equipment needs, and business development requirements.  (*Id.* ¶ 25.)  Smidlein was also one of a small number of executives at ComRent privy to highly confidential documents and discussions relating to a potential sale of the company.  (*Id.*)  He also received proprietary reports and data about all of ComRent's business activities throughout the United States and Canada, and he continued to play an integral role in the company's global strategic planning until the time of his resignation.  (*Id.* ¶ 26.)

As a condition of commencing employment with ComRent, Smidlein was required to execute the ComRent Employee Restrictive Covenant, Confidentiality and Intellectual

Property Agreement (the "Agreement").  (*See id.* ¶ 27; Agreement, Ex. A, ECF No. 1-2.)  Under

the Agreement, Smidlein agreed to the following restrictions on his activities after the

termination of his employment with ComRent:

> Restrictive Covenants. For the mutual promises and consideration exchanged
> as a result of the employment relationship, and for other good and valuable
> consideration, the receipt and sufficiency of which are acknowledged,
> Employee agrees to the following:
>
> (a) While employed by ComRent, and *for one (1) year following the date of termination*
> (the "Termination Date") of Employee's employment for any reason,
> *Employee will not*, without ComRent's express written consent, directly or
> indirectly, either individually or as an officer, director, employee, consultant,
> owner, partner, or agent of any other person or entity, or in any other
> capacity:
>
>> (i) *become employed by, render services to, or contribute Employee's knowledge,*
>> *expertise and abilities to . . . any business*, enterprise, person, or entity *engaged*
>> *primarily in the rental of load banks and related equipment.* For the purposes of
>> this Agreement, a business, enterprise, or entity, or division or subsidiary
>> thereof, shall be defined to be "engaged primarily in" the rental of load
>> banks and related equipment *if ten percent (10%) or more of the gross sales*
>> *revenue of said business*, enterprise, or entity, or division or subsidiary
>> thereof, *is derived from the rental of load banks and related equipment*. . . .
>>
>> (ii) *organize, initiate, create, develop, direct or manage any business*, enterprise, or
>> entity, or division or subsidiary of any business, enterprise, or entity,
>> *engaged in the rental of load banks and related equipment, regardless of the percentage*
>> *of gross sales derived from the rental of load banks and related equipment.*
>>
>> (iii) be compensated, in any form whatsoever, based on rentals of load
>> banks and related equipment. . . .
>>
>> (iv) *solicit or encourage* (including without limitation, by discussion of
>> potential employment terms) *any employee of ComRent to leave the employ of*
>> *ComRent*, or in any way interfere with the relationship between ComRent
>> and its employees and/or service contractors. *Employee also agrees that he*
>> *will not hire or encourage others to hire any such person(s).*

(Agreement §§ 2(a)(i)-2(a)(iv) (emphasis added), ECF No. 1-2.)  In accepting the foregoing

restrictions, Smidlein acknowledged "that ComRent conducts its business throughout the

United States of America and internationally, and that the restrictions contained in this Section 2 [of the Agreement] shall apply throughout the United States." (*See* Agreement § 2(b), ECF No. 1-2.)

In addition to the foregoing covenants, Smidlein also agreed to protect and maintain ComRent's confidential information as follows:

<u>Confidential Information</u>.

(a) Employee acknowledges that the Confidential Information (as defined below) of ComRent is a valuable, unique asset of ComRent and that Employee's unauthorized use or disclosure thereof could cause irreparable harm to ComRent for which no remedy at law could be adequate. Accordingly, *Employee agrees that he shall hold all Confidential Information of ComRent in strict confidence* and solely for the benefit of ComRent, and that *he shall not*, directly or indirectly, *disclose or use or authorize any third party to disclose or use any such Confidential Information.* Employee further agrees that he will not use the Confidential Information for his personal monetary gain, or the monetary gain of any third party such as a future employer. In addition, Employee will use reasonable care to protect Confidential Information of ComRent from inappropriate disclosure, whether inadvertent or intentional. Employee understands that the misappropriation of a trade secret is an actionable offense under state and federal laws. . . .

(b) Employee acknowledges and agrees that all Confidential Information is and shall remain the exclusive property of ComRent, whether or not prepared in whole or in part by Employee, and whether or not disclosed to or entrusted to the custody of Employee. *Employee agrees to turn over to ComRent all of such materials and all copies thereof in Employee's possession or under Employee's control* at the request of ComRent or, in the absence of such a request, *upon the termination of Employee's employment with ComRent.*

(c) For purposes of this Agreement, the term *"Confidential Information" means* and includes any and all trade secrets or *confidential or proprietary information* of ComRent or of any third party to which ComRent has a duty of confidentiality, *including*, but not limited to, (i) *intellectual property*, works of authorship, master works, inventions*, technology*, software, source codes, object codes, *innovations*, improvements, designs, compilations, ideas, know-how, formulas, *techniques*, data, systems, *projects*, processes, methods, discoveries, developments, *procedures*, products, organizational structure, *business plans*, private placement memoranda, organizational documents, *financial statements, financial projections, financial*

*information*, ownership information, investor information, operating records, pricing plans, *customer lists and contracts*, supplier and/or vendor lists and contracts, contact lists, marketing plans and proposals, employee lists, personnel information, and security devices; (ii) *information designated in writing or conspicuously marked as "confidential" or "proprietary"* or by words of similar import; and (iii) information of such a nature that a reasonable person would conclude that it is confidential or proprietary; provided, however, that the term *"Confidential Information" does not include information that was generally available to the public prior to the date of this Agreement or becomes generally available to the public on or after the date of this Agreement as a result of intended action by ComRent or the third party to which ComRent has a duty of confidentiality.*

(*See* Agreement §§ 3(a)-3(c) (emphasis added), ECF No. 1-2.)

ComRent claims it provided Smidlein access to a constantly evolving and wide range of company records, confidential and proprietary information, and trade secrets that were relevant to the performance of his job. (ECF No. 1 ¶ 33.) The confidential and propriety information and trade secrets shared with Smidlein included, but were not limited to, business plans for the entire company; project pipeline information for the entire company; pricing and cost information for all of ComRent's products and services; customer contracts for all industry verticals, regardless of geographic location; customer contact information for all customers; information regarding customer needs and preferences for all customers; customer proposals, regardless of industry vertical or geographic location; company financial information; company sales and revenue data; ComRent's safety procedures and protocols; and employee performance information. (*Id.* ¶ 34.) He was granted access to this information stored in electronic format on password-protected ComRent computers, databases, and servers. (*Id.* ¶ 35.) However, ComRent asserts that Smidlein often printed ComRent business records containing confidential information, and he maintained such business records in hard copy files at an office from which he worked in Omaha, Nebraska. (*Id.* ¶ 35.) ComRent asserts

6

that after the termination of his employment, Smidlein returned only a few of the hard copies of ComRent's business records that he maintained in his Omaha office as required by Section 3(b) of the Agreement.  (*Id.* ¶ 36.)

Over the course of his employment, Smidlein received compensation in the form of salary, commissions, bonuses, and stock options.  (ECF No. 1 ¶ 32.)  By 2019, the last full year of Smidlein's employment with ComRent, Smidlein was paid over $300,000, including $200,000 in base salary and over $120,000 more in commissions, bonuses, and other compensation.  (*Id.*)

## C. Smidlein's Resignation and the Evolving Business of DPS

Smidlein resigned from ComRent effective as of June 26, 2020.  (*Id.* ¶ 37.)  In resigning, Smidlein stated that he intended to comply with the restrictive covenants set forth in the Agreement and told ComRent that he had accepted a position with Co-Defendant DPS as its Vice President of Business Development.  (*Id.* ¶ 39.)  At the time of Smidlein's resignation, DPS was engaged in the business of supplying equipment and services designed for power generation systems.  (*Id.* ¶ 40.)  As such, DPS was not a company that competed with ComRent in the load bank solutions market, but rather, was a company that helped its customers build and operate power generation systems.  (*Id.*)  However, over the months that followed Smidlein's resignation from ComRent, DPS's business evolved and expanded.  (*Id.* ¶ 41.)  DPS began to provide load bank equipment and related services as well.  (*Id.*)  ComRent discovered that DPS had started to acquire load bank equipment for the purpose of offering load bank solutions to customers in competition with ComRent when Carmon Nosic, a sales manager at a company that sells both new and used load bank equipment.  (*Id.* ¶¶ 42-44.)

7

In addition to building an inventory of load bank equipment, DPS also began over the course of the summer and fall of 2020 to recruit and hire ComRent employees who, collectively, allegedly possessed a wide range of ComRent's confidential information regarding ComRent's customers, project pipelines, pricing, costs, and project design and implementation know-how.  (*Id.* ¶ 45.)   The employees hired by DPS include (a) Robert Hughes, a sales representative for ComRent and its Western Account Manager; (b) John Rinck, a former ComRent Director of Sales & Business Development who had previously left the company; (c) Elisha Alpizar, an Inside Sales Manager for ComRent; and (d) Robert Thomson, a Project Manager for ComRent.   (*Id.* at ¶ 46.)   Each of these employees signed an agreement that restricted his or her use of Confidential Information, and some of them signed agreements containing restrictive covenants that imposed restrictions on their employment activities after leaving ComRent.  (*Id.*)

In September 2020, DPS decided to change its name.  (*Id.* ¶ 47.)   An email sent on September 29, 2020 by Robert Hughes (one of Smidlein's direct reports at ComRent who followed him to DPS) stated "[t]o better reflect our business model we are changing our name from Distributed Power Solutions to Load Bank Solutions."  (*See id.*; *see also* Email from Robert Hughes to Greg Kielb, Ex. B, ECF No. 1-3.)   ComRent alleges that DPS is now doing business as Load Bank Solutions and is actively competing with ComRent in the load bank solutions market.  (*Id.* ¶ 48.)

### D. Smidlein's Alleged Breaches of Obligations to ComRent

ComRent alleges that Smidlein has breached his covenant not to recruit ComRent employees, as well as his covenant not to compete by his involvement in managing DPS's load

bank business.  Robert Hughes was a sales representative who worked for ComRent until his resignation effective on or about July 17, 2020 of this year.  (ECF No. 1 ¶ 30.)  Hughes was an experienced salesman who was assigned ComRent's "Western Accounts," a territory that included customers in the same territory for which Smidlein was the Vice President of Sales for ComRent.  (*Id.*)  As such, Hughes reported directly to Smidlein.  (*Id.*)  Hughes resigned from ComRent to join DPS as a sales representative, and ComRent claims that Smidlein was involved in recruiting him.  (*Id.* ¶ 51.)  In an email authored by Hughes and dated July 3, 2020, Hughes wrote, "My boss [*i.e.*, Smidlein] just moved over to a company and he wanted me to come as well.  They gave me a very nice offer.  So I am moving."  (*Id.* at ¶ 52; *see also* Email from Robert Hughes to Delroy Flowers, Ex. C, ECF No. 1-4.)  In another email written by Hughes and sent directly to Smidlein, Hughes thanked him for the DPS job opportunity: "[a]s you mentioned hitting the ground running would not be an issue. . . . [T]here is a ton of work that can be done from home . . . . Dave, thanks for even thinking of me for this position." (ECF No.1 ¶ 53; *see also* Email from Robert Hughes to David, Ex. D, ECF No. 1-5.)

Since leaving ComRent, Hughes has been in contact with Jared Poweski, a sales representative currently employed by ComRent.  (ECF No. 1¶ 56.)  Over the course of several conversations, Hughes allegedly told Poweski that DPS uses sales representatives to sell its products and services.  (*See id.* ¶ 55.)  As part of their responsibilities, DPS sales representatives are actively seeking opportunities for DPS to provide load bank solutions.  (*Id.*)  When a DPS sales representative discovers such an opportunity, Hughes is consulted and provides advice and guidance on how to prepare bids and quotes for the load bank solution opportunity because DPS employees lack this experience and expertise.  (*Id.*)

On or about October of 2020, Hughes called Poweski, who lives approximately 30 minutes from Pearland, Texas.  (*Id.* ¶ 56.)  Pearland is where DPS has its headquarters.  (*Id.*)  Hughes, who lives in Canada, told Poweski that he was coming to Pearland and asked to meet socially while he was in town.  (*Id.* ¶ 57.)  Poweski agreed to meet.  (*Id.*)  In advance of coming to Pearland, Hughes allegedly told Poweski that Smidlein was going to be in Pearland at the same time and suggested that they all meet.  (*Id.* ¶ 58.)  On or about October 22, 2020, Hughes and Poweski met for lunch in Texas.  (*Id.* ¶ 59.)  According to Hughes, Smidlein did not attend the lunch because he was meeting with DPS business managers, including those who were responsible for DPS load bank business.  (*Id.* ¶ 60.)

During the lunch on October 22, Hughes allegedly touted the benefits of working for DPS by saying it was a great company to work for.  (*Id.* ¶ 61.)  Hughes also allegedly told Poweski that he and Smidlein were going to New Orleans after the DPS business meetings in Pearland ended and that they planned to meet the following week with DPS sales representatives as well as Robert Thomson and John Rinck, two other former ComRent employees who had joined DPS.  (*Id.* at ¶ 62.)  At the time, Thomson was the most recent recruit from ComRent and had just been hired to manage load bank solution projects for DPS. (*Id.*)

ComRent has also learned that, at the same time that Hughes and Smidlein were in Pearland, Nosic was there too.  (*Id.* ¶ 64.)  Nosic allegedly had traveled to Pearland to provide training to DPS employees about load bank equipment.  (*Id.* ¶ 65.)  While Nosic was at the headquarters for DPS, she was introduced to Smidlein.  (*Id.* ¶ 66.)

Finally, ComRent asserts that Smidlein was involved, either directly or indirectly through others at DPS, in the recruitment of other ComRent employees.  As noted above, Thomson recently accepted a position at DPS, and before he left ComRent, he told colleagues that he had not been looking for a new job when he was contacted by, and recruited to join, DPS.  (*Id.* ¶ 67.)  When a ComRent employee asked Thomson directly who was involved in recruiting him at DPS, Thomson allegedly refused to answer.  (*Id.*)  ComRent claims that Thomson was a particularly valuable ComRent employee.  As a Project Manager, Thomson was privy to all the details of customer projects.  (*Id.* ¶ 68.)  ComRent also shared with Thomson the expertise it had developed with respect to managing different kinds of projects for Project Owners coming from different industry verticals.  (*See id.*)  ComRent alleges that Smidlein was aware of the confidential information that ComRent had shared with Thomson. (*Id.*)

### E. Defendants' Response to ComRent's Concerns

Concerned by Smidlein's apparent involvement in recruiting and load bank business activities, ComRent wrote to him to demand certain assurances and remedial measures in a letter dated October 28, 2020.  (*Id.* ¶ 70; *see also* Letter from Paul J. Greco to David A. Smidlein, Ex. E, eCF No. 1-6.)  ComRent sent a separate letter on October 29, 2020 to Scott Milligan, the President of CAT Energy Rental Services, a company which ComRent understands to be the parent company of DPS.  (ECF No.1 ¶ 71; *see also* Letter from Paul J. Greco to Scott Milligan, Ex. F, ECF No. 1-7.)  In the letter to Milligan, ComRent explained the existence of the contractual and other legal obligations owed by ComRent's former employees who had been hired by DPS, requested certain assurances, and demanded various remedial actions.

(ECF No. 1 ¶ 71.)  ComRent sent a separate letter on October 29, 2020 to Thomson to demand certain assurances with respect to Thomson's confidentiality obligations and to obtain the return of any ComRent business records which remain in Thomson's possession, custody, or control.  (*Id.*; *see also* Letter from Paul J. Greco to Robert Thomson, Ex. G ECF No. 1-8.)

Smidlein responded in a letter in which he stated that he "has neither contacted, recruited[,] solicited, or influenced to leave any ComRent employees."  (ECF No. 1 ¶ 74; *see also* Letter from James A. Collura, Jr. to Paul J. Greco, Ex. H, ECF No. 1-9.)  Smidlein's response also stated that Smidlein offered to have a ComRent employee come to Nebraska to secure the return of hard copy records and that an individual named Cory Fones did so.  (ECF No. 1 ¶ 77.)  Fones is another Vice President of Sales at ComRent, and Fones took over Smidlein's responsibilities at ComRent after his resignation.  (*Id.* ¶ 78.)  Although Fones did travel to Nebraska to meet with Smidlein, ComRent asserts that the purpose of his visit was to discuss and arrange for the transition of Smidlein's responsibilities.  (*Id.* ¶ 79.)  During Fones' visit, they discussed Smidlein's open projects and spoke by phone with each of the sales representatives who reported to Smidlein.  (*Id.*)  After Fones left, Smidlein sent Fones a small package of hard copy documents.  (*Id.* ¶ 80.)  ComRent asserts, however, that Smidlein did not return all of the documents from ComRent which he maintained in his office in a hard copy format.  (*Id.*)

Based on the foregoing allegations, ComRent asserted five causes of action: (i) breach of contract (Count I) arising out of Smidlein's alleged failure to comply with his restrictive covenant and confidentiality obligations; (ii) tortious interference with contract (Count II) arising out of DPS's alleged knowing employment of Smidlein in breach of his contractual

obligations; (iii) breach of fiduciary duty (Count III) arising out of Smidlein's alleged failure to protect confidential information and trade secrets belonging to ComRent; (iv) aiding and abetting a breach of fiduciary duty (Count IV) arising out of DPS's alleged aid and encouragement to Smidlein to breach his fiduciary obligations; and (v) civil conspiracy (Count V) based upon Smidlein and DPS alleged maliciously combining to commit unlawful acts in violation of ComRent's rights. (ECF No. 1.)   On December 9, 2020, Defendants filed a Motion to Dismiss (ECF No. 15), arguing that ComRent has failed to state a claim for relief.

## STANDARD OF REVIEW

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted.  The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The United States Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required."  *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).  In *Twombly*, the Supreme Court articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal*, 556 U.S. at 678.  First, while a court must accept as true all factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference.

*Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)). Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Iqbal*, 556 U.S. at 679.

While ruling on a motion to dismiss, a court's evaluation is generally limited to allegations contained in the complaint.  *Goines v. Calley Cmty. Servs. Bd.*, 822 F.3d 159, 166-67 (4th Cir. 2016).  However, courts may also consider documents explicitly incorporated into the complaint by reference.  *Id.* at 166 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).  In addition, a court may "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity."  *Id.* (citing *Sec'y of State for Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)).  A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'"  *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted). Considering such documents does not convert a motion to dismiss to one for summary judgment.  *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

## ANALYSIS

### I.    Counts I and II

Defendants move to dismiss Counts I and II of Plaintiff ComRent's Complaint arguing that the contract on which such claims are based, the Agreement, is unenforceable as a matter of law.  (ECF No. 15-1 at 5.)  The Defendants do not claim that ComRent has failed to allege facts sufficient to support claims for breaches of the Agreement.  Instead, the Defendants specifically challenge the validity of the Agreement's restrictive covenants: the restrictions on seeking employment at competing companies, soliciting ComRent's recent clients, and recruiting of ComRent employees.  (*See* Agreement §§ 2(a)(i)-2(iv), ECF No. 1-2.)   The Defendants notably do not challenge the validity of other portions of the Agreement, such as the confidentiality obligations.   ComRent alleges Smidlein breached his confidentiality obligations and that DPS tortuously interfered with Smidlein's performance of such unchallenged obligations.   Therefore, regardless of whether the challenged restrictive covenants are enforceable, dismissal of Counts I and II in their entirety is inappropriate.

Nevertheless, this Court proceeds to an analysis of the restrictive covenants challenged by the Defendants.  As the basis of this Court's jurisdiction lies in diversity of citizenship, under 28 U.S.C. § 1332(a), Maryland law applies.  *Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 261 n. 3 (4th Cir. 2013) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). The Maryland Court of Appeals in *Becker v. Bailey* defined the standard for determining the enforceability of covenants not to compete:

> The general rule in Maryland is that if a restrictive covenant in an employment contract is supported by adequate consideration and is ancillary to the employment contract, an employee's agreement not to compete with his employer upon leaving the employment will be upheld "if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public."  While such restrictions may be enforced under some circumstances,

> there is no sure measuring device designed to calculate when they are.  Rather, a determination must be made based on the scope of each particular covenant itself; and, if that is not too broad on its face, the facts and circumstances of each case must be examined.

299 A.2d 835, 838 (Md. 1973) (internal citations omitted).    Additionally, specifically with respect to covenants not to compete, such restrictions may be applied and enforced by "those employees who provide unique services, or to prevent the future misuse of trade secrets, routes or lists of clients, or solicitation of customers."  *Id.*

Maryland law recognizes the protection of confidential information, trade secrets, and goodwill as legitimate interests that may be protected by restrictive covenants.  *See, e.g.*, *Ruhl v. F.A. Barlett Tree Expert Co.*, 225 A.2d 288, 291-92 (Md. 1967).  Specifically, Maryland regards categories of information like customer-specific history and trends, marketing strategies, pricing information, and business plans to be protectable as trade secrets.  *See General Parts Distrib., LLC v. St. Clair*, No. JFM-11-3556, 2011 WL 6296746, at * 5 (D. Md. Dec. 14, 2011); *Optic Graphics, Inc. v. Agee*, 50 F. Supp. 2d 460, 479 (D. Md. 1999); *Space Aero Prods. Co. v. R.E. Darling Co.*, 208 A.2d 74, 84 (Md. 1965).  Maryland law also recognizes that protecting the goodwill associated with customer relationships and preventing a former employee from trading on his goodwill with former colleagues to persuade them to leave their employment are legitimate interests a company may protect through restrictive covenants.  *See General Parts*, 2011 WL 6296746, at *4 (upholding non-competition clause where employee had responsibilities for customer relationships); *Allegis Grp., Inc. v. Jordan*, GLR-12-2535, 2014 WL 2612604, at *9 (D. Md. June 10, 2014) (enforcing a non-recruitment clause to extent it prohibited the departing executive from recruiting other employees and finding that the senior position of departing employee could enable him to generate goodwill with other employees).

In this case, ComRent alleges that Defendant Smidlein was a highly compensated senior sales executive who was responsible for overseeing the development of customer relationships and who was given access to and provided with confidential business records so that he could participate in managing the strategic direction of the company. ComRent asserts that Smidlein dealt directly with customers to assist ComRent's sales representatives and address problems associated with customer relationships. He was a senior executive who supervised many employees. ComRent therefore argues that the non-competition, solicitation, and recruitment covenants were designed to protect ComRent's legitimate interests in protectable confidential information, goodwill associated with customer relationships, and goodwill of departed employees with former colleagues. There is a plausible claim that such restrictions are reasonably related to the legitimate interests of ComRent.

With respect to the scope of the covenants, the Defendants complain that Smidlein's covenants are unenforceable because they are overly broad in terms of their geographic reach and duration. Geographically, the Agreement's restraint is quite broad, restricting activities anywhere in the United States. (*See* Agreement § 2(b), ECF No. 1-2.) However, a broad scope is not necessarily unreasonable. In *Intelus Corp. v. Barton*, this Court found that given the "broad nature of the market" in which the plaintiff operated, "a restrictive covenant limited to a narrow geographic area would render the restriction meaningless." 7 F. Supp. 2d 635, 642-43 (D. Md. 1998) (citing *Hekimian Labs., Inc. v. Domain Sys., Inc.*, 644 F. Supp. 493 (S.D. Fla. 1987)). Accordingly, this Court has upheld nationwide restrictions. *See, e.g.*, *Allegis Grp*, 2014 WL 2612604, at *6 ("Because [the plaintiff] competes for business on a national and international level, the provision's prohibition of competition throughout the United States

and Canada is reasonable.")  This Court has also upheld restrictions of one year in duration. *See MedServ Int'l, Inc. v. Rooney*, AW-05-3173, 2006 WL 8457083 (D. Md. Mar. 21, 2006).  Any concerns about the equitable extension of this period are irrelevant to the Defendants' pending motion, as ComRent initiated this suit and is seeking injunctive relief before Smidlein's one-year restricted period has elapsed.

Overall, the Agreement contains restrictive covenants, which are in some ways broad, but given the facts as alleged, they are not obviously unreasonable.  If this Court later finds any particular provisions of the Agreement to be excessive under Maryland law, this court may, as it has done several times before, "blue pencil" the offending language, eliminating words that impose an excessive restraint.  *MedServ*, 2006 WL 8457083 at *6 n. 1.  However, given that portions of the Agreement remain unchallenged and enforceable, and that ComRent asserts its claims on the basis of violations of those valid provisions, dismissal of Counts I and II is improper.  ComRent has stated a plausible claim to relief with respect to its theories for breach of contact against Smidlein and tortious interference with a contract against DPS.

## II.    Counts III and IV

In its Complaint, ComRent pleads claims for breach of fiduciary duty against Smidlein (Count III) and aiding and abetting a breach of fiduciary duty against DPS (Count IV). Defendants argue that neither of these claims are viable because Maryland law does not recognize an independent cause of action for breach of fiduciary duty and, by extension, does not recognize claims for aiding and abetting a breach of fiduciary duty either.  This is incorrect. In *Plank v. Cherneski*, the Maryland Court of Appeals specifically held that Maryland law does recognize an independent action for breach of fiduciary duty.  231 A.3d 436 (Md. 2020).  In

doing so, the Court explained why some argue this is not the case, noting that that its decision in *Kann v. Kann*, 344 A.2d 509 (Md. 1997) has been misapplied by subsequent courts. *Plank*, 231 A.3d at 442. As the court explains, *Kann* set out to distinguish fiduciary claims that sounded in tort from those that sounded in equity, and to the extent that *Kann* considered whether Maryland law recognized a breach of fiduciary duty as an independent tort and stated it did not, such conclusions were merely dicta. *Id.* at 451-52, 463. Accordingly, the *Plank* court stated that under Maryland law, "a breach of fiduciary duty may be actionable as an independent cause of action." *Id.* at 465. Maryland law also recognizes that a party may be held liable as a principal if it, by any means, encouraged, incited, aided, or abetted the act of the direct perpetrator of the tort. *Zachair, LTD. v. Driggs*, 762 A.2d 991, 1006 (Md. Ct. Spec. App. 2000). ComRent may bring an independent claim for breach of fiduciary duty, and by extension, a claim for aiding and abetting such a breach.

To prevail on that claim for breach of fiduciary duty, ComRent must demonstrate: "(1) the existence of a fiduciary relationship, (2) breach of the duty owed by the fiduciary to the beneficiary, and (3) harm to the beneficiary." *Id.* at 466. A fiduciary relationship "can be created by common law, by statute, or by contract." *Id.* at 465. "Well-known examples of habitual or categorial fiduciary relationships include those between trustees and beneficiaries, agents and principals, directors and corporations, lawyers and clients, and guardians and wards . . . ." *Id.* ComRent alleges that Smidlein had a fiduciary relationship with the company, serving as a high-ranking executive, and subsequently breached his obligations to maintain confidentiality by refusing to return and using the confidential materials in his possession. (ECF No. 1 ¶¶ 75-81, 122-23.) ComRent also alleges that DPS encourage him to do so, (*id.* ¶

115), and that the company has suffered harm as a result (*Id.* ¶ 124). Asserting these facts, ComRent has stated a plausible claim for relief for a valid cause of action and its derivative under Maryland law.

### III.   Count V

In Count V of ComRent's Complaint, the Plaintiff asserts a claim for civil conspiracy against both Defendants, alleging that Smidlein and DPS formed and operated a malicious combination with a common design to injure ComRent. (ECF No. 1 ¶ 133.) Defendants again challenge such claim on the grounds that Maryland law does not recognize the relevant independent cause of action. It is true that Maryland law does not recognize an independent cause of action for civil conspiracy. *Davenport v. Maryland*, 38 F. Supp. 3d 679, 693 (D. Md. 2014) (citing *Clark v. Md. Dep't Pub. Safety & Corr. Servs.*, 247 F. Supp. 2d 773, 777 (D. Md. 2003). However, that does not mean that ComRent's claim must be dismissed. A plaintiff's claim for civil conspiracy "depends entirely on its liability for a substantive tort." *Id.* Accordingly, ComRent may not prevail on a claim for civil conspiracy if it does not prevail on its tort claims of breach of fiduciary duty and aiding and abetting as provided in Counts III and IV, but at this stage, all ComRent must do is state a plausible claim for relief.

Maryland courts define tortious civil conspiracy as "'a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff.'" *Id.* (quoting *Hoffman v. Stamper*, 867 A.2d 276, 290 (Md. 2005) (internal quotations and citations omitted)). Count V of ComRent's Complaint incorporates by reference all of the allegations of its Complaint regarding the

Defendants' alleged wrongful conduct, and asserts that the Defendants "operated a malicious combination with a common design to injure ComRent" by either (1) unlawfully violating ComRent's contractual, statutory, and common law rights in order to divert business and economic gain from ComRent, or (2) performing lawful acts of competing with ComRent and hiring certain ComRent personnel but through the unlawful means of violating ComRent's contractual, statutory, and common law rights.  (ECF No. 1 ¶¶ 132-33.)  ComRent also asserts it has sustained injuries and damages as a result of this conduct.  (*Id.* ¶¶ 137-38.)  ComRent has stated a plausible claim for relief under Maryland law.

### IV.    Punitive Damages

Finally, the Defendant argues that ComRent has not pled facts sufficient to support a demand for punitive damages.  Under Maryland law, punitive damages must be specifically pled in a complaint.  *Scott v. Jenkins*, 690 A.2d 1000, 1006 (Md. 1997).  As the court in *Scott* explained,"[a] plaintiff seeking to recover punitive damages must allege *in detail* in this complaint the facts that indicate the entertainment by the defendant of [an evil motive or intent]."  *Id.* (citing John A. Lynch, Jr. & Richard W. Bourne, Modern Maryland Civil Procedure § 6.5(b)(2)) (alterations in original).  In this case, ComRent asserts that Smidlein breached a fiduciary duty to ComRent and then lied about such breach when he claimed to have returned all of the company's records.  (ECF No. 1 ¶¶ 77-82.)  ComRent has also alleged that DPS "willfully, intentionally, and/or recklessly interfered" with the performance of Smidlein's Agreement (*id.* ¶ 115), has assisted and/or encouraged him in breaching his fiduciary obligations (*id.* ¶ 130), and conspired with him to engage in various tortious conduct (*id.* ¶¶ 133-35).  ComRent further asserts that conduct of each Defendant was performed with

intent to injure ComRent and without privilege or justification. (*Id.* ¶ 134.)  At this stage, ComRent has pled facts sufficient to state a plausible claim for relief.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss (ECF No. 15) is DENIED.

A Separate Order follows.

Dated: January 26, 2021

_____/s/_____
Richard D. Bennett
United States District Judge